# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| TARIK MATHIS,<br>        *Plaintiff*,<br><br>v.<br><br>NY-CONN CORPORATION,<br>        *Defendant.* | No. 3:19-cv-1489 (MPS) |

## RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Tarik Mathis challenges the termination of his employment by Defendant NY-Conn, Corp. ("NY-Conn"), alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and 42 U.S.C. § 1981 ("Section 1981").  ECF No. 34.  NY-Conn moves for summary judgment on all claims.  ECF No. 90.  For the reasons set forth below, the defendant's motion is granted.

## I.      Factual Background

The following facts, which are taken from the parties' Local Rule 56(a) statements and supporting exhibits, are undisputed unless otherwise indicated.[1]

### A.  Mathis's Hiring and Assignment to Project

Mathis, "an African-American male residing in Hartford, CT," was employed by NY-Conn as a Licensed Electrician.  ECF Nos. 90-2 at ¶ 5; 99-1 at ¶ 5.  NY-Conn was at the time a contractor on State Project 63-633 in Hartford (the "Project").  ECF Nos. 90-2 at ¶ 6; 99-1 at ¶ 6.  Mathis applied for the Licensed Electrician position on May 15, 2018.  ECF Nos. 90-2 at ¶ 7; 99-

---

[1] The plaintiff did not file a Local Rule 56(a) statement with his opposition to the defendant's motion for summary judgment but later moved for permission to file such a statement (and his own signed affidavit) after his response deadline.  ECF No. 99.  That motion is granted, and I have considered the plaintiff's 56(a) statement and accompanying affidavit in ruling on the defendant's motion.

1 at ¶ 7.  A week later, NY-Conn offered him the position, and he participated in an onboarding meeting with NY-Conn's Human Resources Director, Emma Olownia.  ECF Nos. 90-2 at ¶ 8; 99-1 at ¶ 8.  During that meeting, Ms. Olownia reviewed and explained all of NY-Conn's policies and procedures, a process that involved explaining that Mathis was an at-will employee and that NY-Conn had a 90-day probationary period for all new employees (the "Orientation Period").  ECF Nos. 90-2 at ¶ 9; 99-1 at ¶ 9.  Mathis signed off on NY-Conn's Company Guide, confirming his understanding.  ECF Nos. 90-2 at ¶ 10; 99-1 at ¶ 10.

Mathis was assigned to work on the Project, and he started work on-site on May 29.  ECF Nos. 90-2 at ¶ 11; 99-1 at ¶ 11.  He worked under Project Manager Andy Mastrogiannis and Lead Foreman Lou Bicho, who was the Project's on-site supervisor.  ECF Nos. 90-2 at ¶ 12; 99-1 at ¶ 12.  There were four electricians assigned to the Project (Peter Kouloris, Greg Belardinelli, Bicho, and Mathis), as well as one equipment operator (Russell Ballard) and three apprentices (DJ Wisniewski, Genri DeJesus, and Jeff Durkin).  ECF Nos. 90-2 at ¶ 13; 99-1 at ¶ 13.

Project crews of three or four employees were expected to work together to dig trenches, lay and connect conduit, set light pole bases and quasi (or quasite) boxes), and back fill trenches along Albany Avenue in Hartford.  ECF Nos. 90-2 at ¶ 14; 99-1 at ¶ 14.  Because the Project was an outdoor electrical job, all employees, including the licensed electricians, were expected to complete manual labor, such as digging trenches, leveling trenches for conduits and hand-holes, and raking grass areas, when necessary.  ECF Nos. 90-2 at ¶ 23; 99-1 at ¶ 23.  Generally, employees on the Project worked from 7 a.m. until 3 p.m.  ECF Nos. 90-2 at ¶ 15; 99-1 at ¶ 15.  Due to state regulations, NY-Conn was only permitted to complete road work between 9 a.m. and 3 p.m.  ECF Nos. 90-2 at ¶ 16; 99-1 at ¶ 16.  Accordingly, employees working on the Project would complete all work that required obstructing a lane of traffic—which included trenching,

setting hand holes and conduit, digging across the road, and saw cutting—between 9 a.m. and 3 p.m.  ECF Nos. 90-2 at ¶ 18; 99-1 at ¶ 18.  During the 7 a.m. to 9 a.m. period before road work could begin, the employees would work in the sidewalk area and complete any necessary preparation work, including grounding, bonding hand holes, sealing conduits, and any other work that did not obstruct traffic.  ECF Nos. 90-2 at ¶ 17; 99-1 at ¶ 17.  NY-Conn was required to complete all work on the Project within 488 days, per the bid specifications of the Project. ECF Nos. 90-2 at ¶ 19; 99-1 at ¶ 19.  If the work was not completed within that time frame, NY-Conn would be required to pay liquidated damages of $3,400 per day and would be docked payment by the State of Connecticut.  ECF Nos. 90-2 at ¶ 20; 99-1 at ¶ 20.  As a result, time was of the essence.  ECF Nos. 90-2 at ¶ 22; 99-1 at ¶ 22.

### B.  Mathis's Period of Employment

NY-Conn has presented evidence that Mathis's employment with NY-Conn was terminated because of Mathis's poor performance while working on the Project.  Mathis largely disputes NY-Conn's account of his work performance and termination.

According to NY-Conn, Mathis refused to perform certain assigned responsibilities and wasted time during the workday.  Specifically, NY-Conn submitted evidence that Mathis would refuse to do work that he deemed "apprentice work" (such as cleaning and tidying up), even though there is no such thing as "apprentice work" and all employees were expected to assist with all tasks.  ECF Nos. 90-2 at ¶ 37; 90-6 at ¶¶ 40, 45; 90-8 at ¶¶ 48-49.  NY-Conn also submitted evidence that Mr. Mathis regularly stood on the sidelines and spoke to police officers and other passersby instead of helping his team complete tasks, even as supervisors asked him to return to work.  ECF Nos. 90-2 at ¶ 27; 90-6 at ¶¶ 38, 47, 84; 90-5 at ¶ 55, 74, 85; 90-8 at ¶ 45; 90-10 at ¶ 24; 90-11 at ¶ 23; 90-12 at ¶ 37, 49.  Mathis's supervisors and co-workers state in

their declarations that Mathis would leave more difficult tasks for other employees to complete while he would work on simpler, unnecessary tasks, thus creating more work for his coworkers and prompting them to complain to Bicho.  ECF Nos. 90-2 at ¶¶ 29-30; 90-6 at ¶¶ 40-42, 48; 90-5 at ¶ 57; 90-8 at ¶¶ 50-54; 90-11 at ¶ 15.

Mathis disputes these facts.  He presents evidence, in the form of his own affidavit, that he never refused to perform any work or complained about any work being "apprentice work" that was beneath him.  ECF No. 99-2 at ¶ 15.  He also avers that he did not neglect work to speak to police officers or others.  *Id.* at ¶ 16.  According to Mathis, if he paused work to engage in conversation, it was because he was taking an authorized break.  *Id.*  He points to Bicho's acknowledgment in his declaration that "[t]here were no set lunch breaks during the day, rather employees were expected to bring food, drinks, and lunch to the site and were permitted to take breaks as necessary to eat and hydrate themselves" as additional support.  ECF No. 90-6 at ¶ 13. He also avers that on occasions when other employees were completing tasks such as sweeping, he was told to stand still and watch the crew's excavator to ensure he did not hit any pipes.  ECF No. 99-2 at ¶¶ 8, 33.  He states that there was, in general, a lot of downtime for everyone working on the Project because they had to stand around and wait for the excavator before doing their work.  *Id.* at ¶¶ 23-25, 33.

NY-Conn also submitted evidence of specific instances when Mathis failed to perform his job responsibilities as an electrician.  Bicho, the Project's Lead Foreman, and Belardinelli, another electrician assigned to the Project, stated in declarations submitted by NY-Conn that it should take a new employee like Mathis about one week to understand job tasks.  ECF Nos. 90-6 at ¶ 57; 90-8 at ¶ 44.  But according to Belardinelli, Mathis had to "continually ask the same questions concerning how to complete his assigned tasks, despite the tasks being repetitive in

4

nature." ECF No. 90-8 at ¶ 43.  Belardinelli stated that on one occasion, Mathis was assigned to lay and connect a pipe in a trench but failed to do so.  *Id.* at ¶¶ 56, 59-60.  Mathis was the last person in the trench, and after he was done in the trench, an equipment operator began backfilling the trench.  *Id.* at ¶¶ 57-59.  Belardinelli then learned that Mathis had not connected the conduit.  *Id.* at ¶ 59.  As a result of Mathis's failure to connect the conduit, the crew had to re-open the trench, and Belardinelli had to properly connect the conduit.  *Id.* at ¶ 60.  This process was time-consuming because Belardinelli and his crew had to be careful not to break the conduit or otherwise disturb the wiring.  *Id.* at ¶ 61.  Belardinelli and Wisniewski, an apprentice electrician, both described in their declarations another occasion on which Mathis failed to complete a task assigned to him.  On that occasion, Mathis was tasked with snaking a conduit and connecting the conduit with a three-piece coupling, a task Belardinelli described as a "routine task for a licensed electrician." *Id.* at ¶¶ 52-53.  Mathis had difficulty completing the task, and he eventually gave up.  ECF Nos. 90-8 at ¶¶ 53-54; 90-9 at ¶¶ 14-15.  Wisniewski had to fill in to complete the task.  ECF Nos. 90-8 at ¶ 55; 90-9 at ¶ 15.

Mathis, in contrast, states in his affidavit that he could perform all tasks expected of him, that the work on the Project was easy, and that he did not require close monitoring or step-by-step instruction in order to complete his work.  *Id.* at ¶¶ 3, 10, 20-21, 37.  He avers that he was able to complete tasks such as snaking conduit and maintains that the incidents described by Bicho, Belardinelli, and Wisniewski in their affidavits did not occur.  *Id.* at ¶¶ 10-12, 30-31.  Specifically, he denies in his affidavit struggling to snake a pipe and giving up, leaving Wisniewski to complete the task.  *Id.* at ¶ 30.  He also denies that he failed to connect a pipe before a trench was backfilled, creating additional work for the crew and delay.  *Id.* at ¶ 31.  He states that "[t]here were always two to three crew [m]embers involved with connecting pipes . . .

[s]o it would be impossible for [him] to have failed to connect a pipe without someone else being involved." *Id.*

According to NY-Conn, production on the Project decreased during the period of Mathis's employment due to his poor performance. ECF No. 90-5 at ¶¶ 98-107; *see also id.* at 91. Specifically, NY-Conn was making approximately $15 less per hour, on average, and the sidewalk contractor moved from being 500 feet behind the NY-Conn team to only 200 feet behind the team. *Id.* at ¶¶ 102-05. In addition, as Mathis's employment went on, Bicho began receiving an increasing number of complaints from other crew members regarding Mathis's performance. ECF No. 90-6 at ¶¶ 39-41. Bicho received complaints from every crew member on the job site. *Id.* at ¶ 39.

Mathis admits that productivity decreased during his employment and that his co-workers complained, but he denies responsibility for the loss of productivity as well as the suggestion that the complaints were justified. ECF Nos. 99-1 at ¶¶ 41-42;[2] 99-2 at ¶¶ 18-19, 22-25. He avers that the NY-Conn crew was missing a digger named Manny during the period of Mathis's employment, and that Manny's absence, rather than any poor performance by Mathis, was the true cause of any loss of production. ECF No. 99-2 at ¶¶ 18, 22-23. He further avers that he did not stand around while his fellow crew members were working, instead stating that there were frequent periods when many members of the crew had nothing to do. *Id.* at ¶¶ 19, 23-25. In addition, while Mathis admits that crew members may have complained to Bicho, he states in his affidavit that those complaints were meritless. ECF Nos. 99-1 at ¶ 42; 99-2 at ¶ 19.

According to NY-Conn, Bicho began watching Mathis's performance more closely after receiving complaints from crew members about Mathis. ECF Nos. 90-2 at ¶ 49; 90-6 at ¶ 42.

---

[2] The paragraph numbers in Mathis's 56(a)2 Statement do not consistently match those in NY-Conn's 56(a)1 Statement, but the language in his 56(a)2 Statement indicates that he is disputing these claims.

He observed that Mathis made comments that certain work was "apprentice work" or "laborer work," that he would stand on the sidewalk speaking to fellow employees (who were working), police officers, or passersby "approximately seventy-five . . . percent of the time that [he] was supposed to be working," that he "regularly substitute[d] more involved tasks for simpler tasks, gather[ed] equipment that was not needed for the present task, and fail[ed] to take initiative to move onto the next step after completing a task," that he "constantly had to be monitored and instructed on tasks, despite the fact that the tasks were generally the same day to day," and that his "performance efficiency steadily declined over the course of his employment" rather than increasing (as is typical).  ECF Nos. 90-2 at ¶¶ 46-48; 90-6 at ¶¶ 47-52.  Bicho communicated the crew members' complaints and his own observations about Mathis to Mastrogiannis.  ECF Nos. 90-2 at ¶ 45; 90-5 at ¶¶ 53, 57.

During the week of July 1, 2018, Mastrogiannis was on site daily supervising Mathis's crew because Bicho was on vacation.  ECF Nos. 90-2 at ¶ 52; 90-5 at ¶¶ 62-63; 90-6 at ¶ 91.  During that week, Mastrogiannis observed that Mathis regularly stood around speaking to other people when others were working, and that Mathis could not perform certain tasks such as threading or cutting a pipe despite being shown how to do so numerous times.  ECF Nos. 90-2 at ¶¶ 54-55; 90-5 at ¶¶ 64, 73-74.  When Bicho returned from vacation on July 9, he and Mastrogiannis discussed Mathis's performance.  ECF Nos. 90-2 at ¶ 56; 90-5 at ¶¶ 78-79; 90-6 at ¶¶ 92-95.  During that conversation, the two agreed that Mathis's employment with NY-Conn was not "working out," and Bicho recommended that he be terminated.  ECF Nos. 90-2 at ¶ 57; 90-5 at ¶ 79; 90-6 at ¶ 95.

The next day, July 10, Mastrogiannis observed Mathis not working and failing to assist his fellow crew members as they struggled to set a light pole base.  While the rest of the crew

struggled, Mathis walked down the sidewalk and spoke to a police officer.  It ultimately took the crew three attempts to set the light pole base.  ECF Nos. 90-2 at ¶¶ 38-40, 58; 90-5 at ¶¶ 80-86; 90-11 at ¶¶ 20-23; 90-12 at ¶¶ 46-49.  This incident pushed Mastrogiannis to "make the final determination to terminate [Mathis]."  ECF No. 90-5 at ¶ 87.  He pulled Mathis aside and told him that he was being terminated because he was failing to perform his job responsibilities and to keep up with the pace of the Project.  ECF Nos. 90-2 at ¶ 59; 90-5 at ¶¶ 90-92.

Mathis states in his affidavit that the reason it took crew members three attempts to set the light pole base was "because there was something underneath" and "Russell, the excavator supervisor, kept hitting a duct bank underneath."  ECF No. 99-2 at ¶ 17.  He also maintains that no one explained to him why he was being terminated at the time he was let go, and that he never received any warnings regarding his performance.  *Id.* at ¶¶ 2, 44.

### C.  *Mathis's Relationships with Fellow Crew Members and Supervisors*

The parties dispute whether Bicho and others working on the Project provided Mathis access to blueprints and plans for each day of work on the Project.  Mathis avers that new prints were needed at each new location where the crew worked so that crew members would know what work needed to happen next, but that "Defendant supervisors, managers, and other crew members denied [him] access to" the prints.  ECF No. 99-2 at ¶ 35.  At his deposition, however, Mathis stated that when he started on the Project, Bicho was not providing the prints to other crew members (Ballard and an apprentice named Henry, who was presumably Genri DeJesus), ECF No. 90-7 at 127-28,[3] but that Bicho began making the prints available to the crew at Mathis's request (although he stopped doing so after a brief period), *id.* at 128-29.[4]  According to

---

[3] This Ruling cites ECF page numbers throughout.
[4] Mathis "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."  *Crawford v. Franklin Credit*

NY-Conn, Mathis was provided with the prints but either did not review them or had trouble understanding them.  ECF Nos. 90-2 at ¶¶ 62-64; 90-6 at ¶¶ 20-28; 90-8 at ¶¶ 13-16, 65-66; 90-9 at ¶¶ 9-10; 90-10 at ¶¶ 9-10; 90-11 at ¶¶ 9-11; 90-12 at ¶¶ 11-13.  Mathis also avers that "the apprentice on the crew, Henry (sp) [presumably DeJesus] was given more information than [he] was given," ECF No. 99-2 at ¶ 40, but he testified at his deposition when questioned on this point that while Bicho at times gave information to "Henry" but not Mathis, Bicho on those occasions also failed to share the information to the rest of the Project team, ECF No. 90-7 at 126-27.

The parties also dispute whether Mathis displayed initiative while working on the Project.  According to Mathis, he "was always thinking ahead and suggesting faster[] ways to get the work done."  ECF No. 99-2 at ¶ 4.  He states that he "took the initiative to thread pipes early at the start of the work day so that they could be available as soon as trenches were dug." *Id.* at ¶ 37.  He also states that he suggested to Bicho that the crew lay out light poles and bases along the sidewalks while excavators dug the trenches "so that once the trenches were dug [the crew] would have them readily available." *Id.* at ¶ 36.  According to Mathis, Bicho ignored the suggestion at the time, but Mathis observed that the crew began laying out the poles and bases as he suggested after he was terminated. *Id.*  According to NY-Conn, Mathis's suggestion would not have improved efficiency because a backhoe is needed to transport materials from the storage site to the job site, where the backhoe is then used to place them directly into the trench.  ECF Nos. 90-2 at ¶¶ 93-94; 90-8 at ¶ 83; 90-12 at ¶ 29.  If the crew had adopted Mathis's suggestion, the materials would need to have been moved twice instead of only once.  ECF No. 90-12 at ¶

---

*Mgmt. Corp.*, 758 F.3d 473, 482 (2d Cir. 2014).  Thus, to the extent statements in Mathis's affidavit contradict his testimony during his deposition, I credit the deposition testimony.

29.  Also, there was not enough room on the sidewalk to store the materials there until they were

needed.  ECF No. 90-8 at ¶ 84.

According to Mathis, "[o]ther employees on [the] crew appeared not to want to work

with [him]," as evidenced by their demeanor towards him,  which was "frowning and

disapproving."  ECF No. 99-2 at ¶ 40.  He noticed that other crew members, especially

Belardinelli and Durkin, displayed a demeanor that "was frowning and stern when speaking with

[Mathis] unlike their demeanor when they spoke with Caucasian crew members."  *Id.* at ¶ 43.

He states in his affidavit that his coworkers "seemed to resent it when [he] took the initiative to

suggest ways to be more efficient, even when [he] requested prints for how the job was to

proceed."  *Id.*  He also avers that Ballard, the equipment operator, appeared "surprised when he

learned that [Mathis] was a licensed journeyman electrician" and "remarked that [Mathis] was

going to be making a lot of money, even more money than [Ballard] made."  *Id.* at ¶ 41.

     *D.  Mathis's Termination*

According to NY-Conn, it has consistently maintained that Mathis was terminated due to

his poor performance except in unemployment paperwork it prepared indicating the reason for

termination as "lack of work" to enable Mathis to collect unemployment benefits following his

termination.  ECF No. 101 at 11.  According to NY-Conn, on July 10 (the day Mastrogiannis

terminated Mathis), Mastrogiannis informed Mathis that he was being terminated because he was

failing to perform his job responsibilities and to keep up with the pace of the Project.  ECF Nos.

90-2 at ¶ 59; 90-5 at ¶¶ 90-92.  In addition, Olownia stated in her declaration that Mastrogiannis

told her on July 10 that he had terminated Mathis's employment due to "performance reasons,"

and that she informed Mathis the following day "that he was let go due to a performance

evaluation by Mr. Mastrogiannis within his 90 Day Orientation Period."  ECF No. 90-4 at ¶¶ 51-

52.  A NY-Conn "Termination Report" dated July 10 indicates that the "reason for termination" was "performance."  *Id.* at 61.  In an August 16, 2018 investigative report Olownia prepared summarizing the findings of her investigation into the discrimination complaint Mathis submitted to NY-Conn on July 18, *id.* at 68-70, Olownia concluded that Mathis had been terminated "due to performance issues," including "wasting time, money, and causing other employees to pick up his slack."  *Id.* at 98.  NY-Conn also informed the CHRO that Mathis was terminated due to poor performance.  *Id.* at 116-117.

NY-Conn acknowledges that the State of Connecticut "Unemployment Notice" it prepared when Mathis was terminated indicated that the "reason for unemployment" was "lack of work" rather than "discharge/suspension."  *Id.* at 60.  Olownia states in her declaration that she completed the unemployment notice this way because Mastrogiannis "requested that [she] process[] the termination as a lay-off so Plaintiff could receive unemployment benefits."  *Id.* at ¶ 45.  Mastrogiannis also states in his declaration that he "asked Ms. Olownia if she could process the termination as a lay off to ensure that Plaintiff would be able to collect unemployment benefits."  ECF No. 90-5 at ¶ 96.

Mathis wrote in his July 18 complaint to NY-Conn that he "was told [he] was let go because of [his] work performance," ECF No. 90-4 at 68, but he later testified at his deposition that "nobody" at NY-Conn told him he was terminated for poor work performance, and that he only later learned during the CHRO proceeding that NY-Conn identified performance as the reason for his termination.  ECF No. 90-7 at 174.  He also avers that Mastrogiannis "did not give [him] a reason for the termination" when Mastrogiannis fired him.  ECF No. 99-2 at ¶ 44.

   *E.  Information Regarding NY-Conn's Termination of Other Employees*

Mathis was terminated during his 90-day Orientation period.  ECF Nos. 90-2 at ¶ 60; 99-1 at ¶ 60.  From October 2016 to October 2018, NY-Conn terminated a total of forty employees. ECF No. 98-2 at 7.  Six of those employees (none of whom were African American) were terminated for attendance reasons.  *Id.*  Thirteen employees (including Mathis) were terminated because they "[d]id not work out" within their 90-day Orientation Period; ten of those employees were white.  *Id.*; *see also* ECF Nos. 90-2 at ¶ 61; 99-1 at ¶ 60.  Mathis was the only African American craft worker terminated for this reason during this timeframe.  ECF No. 98-2 at 7.  In addition, NY-Conn laid off twenty-one employees during this period; the only African American employee in this group was, like Mathis, a craft worker.  *Id.*

### F.  Procedural Background

On September 7, 2018, Mathis filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC").  ECF Nos. 90-2 at ¶ 2; 99-1 at ¶ 2.  On April 26, 2019, the CHRO held a full fact-finding hearing before a Human Rights Investigator, at which Mathis was represented by counsel and had the opportunity to testify on his own behalf (which he did), call witnesses on his own behalf, and cross-examine NY-Conn's witnesses (which he did).  ECF Nos. 90-2 at ¶ 3; 99-1 at ¶ 3.  On May 24, 2019, the CHRO issued a Draft Finding of No Reasonable Cause.  ECF Nos. 90-2 at ¶ 4; 99-1 at ¶ 4.  Mathis then filed this suit in September 2019.  ECF No. 1.

## II.  Legal Standard

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted).  In reviewing the summary judgment record, a court must "construe the facts in the light most

favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

### III.   Discussion

#### A.   Applicable Law

Mathis claims that NY-Conn discriminated against him on the basis of race in violation of Title VII and Section 1981. ECF No. 34 at 7. Title VII makes it unlawful for an employer to discriminate against any individual because of that individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). "An employment decision . . . violates Title VII when it is based in whole or *in part* on discrimination." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (internal quotation marks omitted) (emphasis in original). Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contract . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). It defines "make and enforce contracts" to include the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Like

Title VII, Section 1981 "prohibits employment discrimination based on race." *Stembridge v. New York City Dept. of Educ.*, 622 F. App'x 6, 7 (2d Cir. 2014) (summary order).

Courts evaluate both Title VII and § 1981 employment discrimination claims under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Khanna v. MUFG Union Bank, N.A.*, 785 F. App'x 15, 15 (2d Cir. 2019) (summary order) (addressing the plaintiff's Title VII and Section 1981 "claims together because 'the substantive standards applicable to claims of employment discrimination under Title VII, are also generally applicable to claims of employment discrimination brought under § 1981 . . . .'") (quoting *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010)) (alterations omitted). Under this framework, a plaintiff must first establish a *prima facie* case of discrimination "by showing that: (1) he was a member of a protected class; (2) he was competent to perform the job in question, or was performing the job duties satisfactorily; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that give rise to an inference of discrimination." *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010). "The burden a plaintiff, alleging that he was discriminated against by his employer, carries to survive a summary judgment motion at the *prima facie* stage is a minimal one." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d. Cir. 2000). Once the plaintiff has established *prima facie* case, the burden then "shifts to the employer to articulate a legitimate, non-discriminatory reason for the employee's dismissal." *Id.* If the employer is able to provide such a reason, then the employee must demonstrate "that the legitimate reason[] offered by the [employer] w[as] not its true reasons, but w[as] a pretext for discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

      *B.* Prima Facie *Case*

NY-Conn does not contest that Mathis belongs to a protected class and that his termination constituted an adverse employment action, nor does it contest that Mathis possessed the qualifications necessary for the position he held.  ECF No. 90-1 at 13.  Rather, it argues that Mathis has failed to present evidence (1) that he was performing his job responsibilities satisfactorily or (2) of any circumstances that could give rise to an inference of discriminatory intent.  *Id.* at 13-14.

NY-Conn argues that "undisputed evidence [shows] that [Mathis] did not perform his job duties satisfactorily."  *Id.* at 14.  But Mathis has presented some evidence (his statements in his own affidavit) indicating that he was able to—and did—perform all tasks required of him, that he stood idle only when taking permitted breaks or when observing excavators as directed by his supervisors, and that factors other than Mathis's work performance (such as the absence of a second excavator during the period of Mathis's employment) caused the loss of production on the Project.  As I explain below, this evidence cannot be used to support an inference that NY-Conn's stated reason for terminating Mathis (poor work performance) was pretextual, but it is sufficient to meet Mathis's minimal burden of showing that he was performing his duties satisfactorily at the *prima facie* case stage.

NY-Conn next argues that Mathis has failed to present evidence of any circumstances that could give rise to an inference of discriminatory intent.  Mathis points to Second Circuit precedent holding that "[a] plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably," *Norville v. State Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999), and argues that NY-Conn treated him less favorably than employees outside his protected group.  ECF No. 98 at 15-16.

In support of this argument, Mathis marshals various assertions, including that he was "the sole African American electrician on the job;" that "his presence on the job as a licensed journeyman electrician caused surprise, envy, and apparently dismay" (based on Ballard's apparent surprise that Mathis was a licensed journeyman electrician and his remark that Mathis would be earning more money than he would); that Mathis "was not accorded the same right to job-related information as other crew members"; and that NY-Conn "terminated only a very small number of craft workers for cause" and that "their record of African American workers on the job who were terminated for any reason is extremely small" (based on NY-Conn's termination records). ECF No. 98 at 17.

The fact that Mathis was the only African American electrician working on the Project cannot support an inference of discrimination unless it is combined with evidence that Mathis was treated less favorably than non-African-American employees by NY-Conn, and Mathis has failed to present such evidence. It is undisputed that Mathis was supervised by Bicho and Mastrogiannis and not by other employees such as Ballard, and that he was fired by Mastrogiannis. Thus, any evidence that Ballard or other employees treated Mathis unfavorably (by, for example, expressing surprise at his qualifications, demonstrating a "frowning and disapproving" demeanor toward him, or not sharing information with him while sharing it with other employees) cannot support an inference that NY-Conn acted with discriminatory intent when it terminated Mathis.[5] And Mathis has presented no evidence that Bicho or Mastrogiannis expressed surprise or dismay regarding Mathis's qualifications or earning potential, demonstrated an unfriendly or disapproving demeanor toward him, or refused to share Project information with him while sharing it with other employees at Mathis's level.

---

[5] Mathis has not made a hostile work environment claim.

NY-Conn's October 2016-October 2018 termination data also cannot support an inference of discrimination, as it does not indicate that NY-Conn terminated African American employees in greater numbers (or at a higher rate) than non-African-American employees. Mathis was the only African American craft worker that NY-Conn terminated for "not work[ing] out within the 90 Day Orientation Period" in this timeframe; during the same period, NY-Conn terminated four white craft workers for that reason. ECF No. 98-2 at 7. In addition, only two African American employees (including Mathis) were terminated for not working out during this timeframe, versus eleven non-African-American employees (ten white and one American Indian or Alaska Native). *Id.* Out of the forty employees whose employment was terminated during the October 2016-October 2018 period, only three were African American. *Id.*

In sum, Mathis has failed to present any evidence from which a reasonable juror could infer that NY-Conn acted with racially discriminatory intent when it terminated his employment. Thus, Mathis has failed to satisfy the "minimal" burden required to make out a *prima facie* case of discrimination at the summary judgment stage. I will nevertheless proceed to the second step of the *McDonnell Douglas* analysis as if Mathis had satisfied this burden.

### C. Non-Discriminatory Reason

Assuming that Mathis had established a *prima facie* case, the burden would then shift to NY-Conn to offer a legitimate, non-discriminatory reason for its decision to terminate Mathis's employment. NY-Conn does so by presenting evidence that it terminated Mathis due to his poor work performance. Specifically, NY-Conn has presented evidence that both Bicho, Mathis's direct supervisor, and Mastrogiannis, the Project Manager, directly observed poor work performance by Mathis; that they discussed together that Mathis's employment wasn't working

out; and that Mastrogiannis ultimately fired Mathis after observing him failing to assist his coworkers as they struggled to set a light pole base.

### D.  Pretext

Because NY-Conn has offered a legitimate, non-discriminatory reason for terminating Mathis, the burden shifts back to Mathis to demonstrate that this stated reason is pretextual. Mathis argues that there is evidence in the record from which a reasonable juror could infer that NY-Conn's stated reason is pretextual.  I disagree.

Mathis centrally argues that NY-Conn has offered inconsistent reasons for Mathis's termination, and that a reasonable juror could infer pretext from evidence of this inconsistency. The Second Circuit has recognized that a shift in an employer's stated justification for an employee's discharge can constitute evidence of pretext.  *See Zann Kwan*, 737 F.3d at 847 (discrepancy between reasons for termination employer provided to EEOC and reasons later offered in the course of litigation could lead "a reasonable juror [to] infer that the explanations given by [the employer] were pretextual"); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) (inconsistency between employer's earlier report to EEOC that plaintiff was let go for economic reasons and that job performance was not a factor and its later explanation in interrogatory responses and depositions taken for federal lawsuit that plaintiff was fired for job performance created genuine issue of material fact as to why plaintiff was terminated); *DeMarco v. Holy Cross High School,* 4 F.3d 166, 171 (2d Cir.1993) (stating that pretext inquiry takes into consideration "whether the putative non-discriminatory purpose was stated only after the allegation of discrimination").[6]

---

[6] The decisions of other circuits cited by plaintiff also involved situations where the employer changed its stated reason for an employment decision over time.  *See Ameristar Airways, Inc. v. Admin. Rev. Bd., U.S. Dep't of Lab.*, 650 F.3d 562, 569 (5th Cir. 2011)("[n]ot until long after [the employee]'s discharge did [the employer] allege the other four reasons, tending to suggest those reasons are a mere litigation figment")(internal quotation marks

In this case, however, there has been no shift over time in NY-Conn's stated reason for terminating Mathis.  It is undisputed that a "Termination Report" prepared by NY-Conn on July 10, 2018 (the day of Mathis's termination) indicates that Mathis was terminated for performance reasons, ECF No. 90-4 at 61, that NY-Conn informed the CHRO that Mathis was terminated due to poor performance, *id.* at 116-17, and that NY-Conn has in the course of this suit consistently maintained that it terminated Mathis's employment due to his poor performance.  The discrepancy in reasons Mathis identifies arises from NY-Conn's indication in a July 10, 2018 "Unemployment Notice" provided to the State Department of Labor that Mathis was laid off rather than terminated for performance issues.  ECF No. 90-4 at 60.  This form was completed on the same day as the internal "Termination Report" indicating Mathis was terminated for performance reasons, and so it does not indicate that NY-Conn originally offered one reason for Mathis's termination (that it was a layoff) then later changed its answer (to claim it was for cause).  In addition, because the "Termination Report" was prepared before Mathis submitted his initial discrimination complaint to NY-Conn on July 18, there is no evidence that could support an inference that NY-Conn's "putative non-discriminatory purposes [for terminating Mathis] was stated only after [his] allegation of discrimination."  *DeMarco*, 4 F.3d at 171.

Further, NY-Conn has presented evidence that it indicated in the unemployment form that Mathis was laid off rather than terminated in order to enable him to collect unemployment benefits, and Mathis has presented no evidence to rebut this assertion.  (His observation that NY-Conn's termination records indicate that NY-Conn "knew how to distinguish a laid off employee from one who has been terminated for cause," ECF No. 98 at 17, does not help him, as NY-Conn

_____

omitted); *Vieques Air Link, Inc. v. U.S. Dep't of Lab.*, 437 F.3d 102, 110 (1st Cir. 2006)(affirming finding of pretext based on fact that employer did not offer a particular explanation for an employee's transfer until an administrative hearing conducted after the employee filed a complaint with the Department of Labor).

does not indicate that it erred in marking him as terminated for "lack of work" in the unemployment form.  In addition, that record indicates that Mathis was terminated for not working out during his Orientation Period, and not that he was laid off.)  I also note that, to the extent either party's account of the termination has shifted over time, it is Mathis's.  While Mathis testified at his deposition and states in his affidavit that Mastrogiannis never informed him of the reason for his termination, Mathis wrote in his initial, July 18, 2018 complaint to NY-Conn that "[he] was told [he] was let go because of [his] work performance."  ECF No. 90-4 at 68.  In any event, I conclude that no reasonable juror could infer pretext from the discrepancy between the reason for termination offered in the unemployment form and that listed in another form completed the same day, and otherwise consistently set forth by the defendant in administrative proceedings and this lawsuit, especially where the defendant has offered evidence of a legitimate reason for that discrepancy that the plaintiff has failed to rebut.

Mathis's other arguments that the evidence in the summary judgment record could support an inference of pretext also prove unsuccessful.  While Mathis argues that there is a dispute of material fact regarding whether he failed to perform his job duties as NY-Conn argues, and so a reasonable juror could conclude that NY-Conn's assertion that it terminated him for that failure is pretextual, the only evidence Mathis presents to dispute NY-Conn's evidence of his performance issues is his own account of his job performance.  But such evidence cannot be used to show that NY-Conn's stated reason for Mathis's termination is pretextual.  *Ricks v. Conde Nast Publications, Inc.*, 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000), *aff'd*, 6 F. App'x 74 (2d Cir. 2001) ("The mere fact that an employee disagrees with her employer's assessments of her work, however, cannot standing on its own show that her employer's asserted reason for termination was pretextual.").  In addition, his argument that his coworkers' attitudes toward him "create[] a

genuine question" about whether their complaints about his work performance "were truthful," ECF No. 98 at 9, cannot support an inference of pretext, both because nothing in the record suggests those attitudes were racially motivated and because the evidence presented by the defendant indicates that the decision to terminate him was not based solely on those complaints but also on the direct observations of Bicho and Mastrogiannis.

Further, to the extent Mathis contends that he has presented evidence of pretext by presenting evidence that other employees who engaged in the conduct for which he was terminated were not terminated, that argument also fails. While evidence that employees not in a plaintiff's protected group who engaged in conduct that formed the basis for the plaintiff's termination were not terminated can constitute evidence of pretext, *see McDonnell Douglas*, 411 U.S. at 804 (holding that "evidence that white employees involved in acts against [the employer] of comparable seriousness to the [act for which plaintiff was fired] were nevertheless retained or rehired" would be "[e]specially relevant to . . . a showing [of pretext]"), Mathis has not presented such evidence here. Mathis states in his affidavit that other employees took breaks during the day and stood around waiting for the excavator to dig trenches. But NY-Conn does not claim to have terminated Mathis for taking breaks or observing the excavator; rather, it presents evidence that it terminated him for an assortment of reasons, including not only his habit of pausing work to engage in conversation or otherwise stand idle when those around him were working but also his inability or failure to perform basic tasks expected of an electrician (such as threading a pipe or connecting a conduit), his tendency to leave tasks for other crew members to complete because he was unable or unwilling to complete them, his refusal to perform "apprentice work" he deemed beneath him, and his need for constant monitoring and instruction. Mathis has presented no evidence that his coworkers engaged in such conduct.

21

Finally, Mathis's argument that he would not behave against his own pecuniary interest by acting in the manner his former supervisors and coworkers state that he did also fails to create a dispute of material fact; it suggests that no employee would ever fail to perform his or her job responsibilities because doing so would be against that employee's pecuniary interests, but such a suggestion is implausible.  Thus, Mathis has failed to present evidence from which a reasonable juror could infer that NY-Conn's stated reason for terminating Mathis—his poor work performance—was pretextual or that the real reason was racial bias.

## IV.  Preclusive Effect of CHRO Proceeding

Because I conclude that NY-Conn is entitled to summary judgment due to Mathis's failure to present evidence from which a reasonable juror could infer that NY-Conn discriminated against him, I do not address NY-Conn's argument that the CHRO finding precludes this action.

## V.  Conclusion

For the reasons set forth above, the defendant's motion for summary judgment (ECF No. 90) is GRANTED.

IT IS SO ORDERED.

                                                    /s/
                                              Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              February 28, 2022

22